CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
APR 0 4 2007
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| SUN LIFE ASSURANCE COMPANY, *Plaintiff*, | CASE NO. 6:06-CV-00010 |
| v. | MEMORANDUM OPINION |
| SANDRA TINSLEY, *et al*, *Defendant*. | JUDGE NORMAN K. MOON |

## I. BACKGROUND

On November 16, 2005, after a battle with cancer, Rowland Lee Smith died in Lynchburg, Virginia. Through his employer, Randolph-Macon Women's College, he had a retirement plan and life insurance. Sun Life Assurance Company, the life insurance provider, faced competing claims for Smith's $30,000 policy. Sandra Tinsley, his longtime girlfriend, claimed the whole of the policy based on the beneficiary designation Smith filled out when he first obtained the policy in 2002. Hutcherson Funeral Home, Louise Smith (Rowland's sister and co-administrator of Evelyn Turner's estate), and Louis Smith (Rowland's brother and co-administrator of Evelyn Turner's estate) each claimed a share based on a change of beneficiary form signed by Rowland on October 31, 2005, 14 days before his death, while gravely ill and in the hospital. It provided that the funeral expenses should be paid and the remainder should be

divided equally between Turner (Rowland's mother),[1] Louise, and Tinsley. Sun Life, faced with potentially conflicting obligations, filed this interpleader action on March 27, 2006. After depositing the proceeds of the policy with the Clerk, Sun Life was dismissed from the case on January 22, 2007. On March 12 and 14, 2007, a bench trial was held, in which Tinsley, Louis, and Louise appeared and offered evidence. Hutcherson Funeral Home has never responded to the summons, apparently because it has already been paid from other sources.

The sole issue in the case is whether Rowland Smith's change of beneficiary is valid or must be set aside due to either incompetence or undue influence.

## II. GOVERNING LAW

Jurisdiction is proper under 28 U.S.C. § 1331, because all claims are governed by federal law as discussed below. No objections to personal jurisdiction or venue were raised.

All aspects of the life insurance policy in this case are governed by the Employee Retirement Income Security Act (ERISA). This Act governs "any plan, fund, or program which...was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ...benefits in the event of...death." 29 U.S.C. § 1002(1) (2007). Although a one-time benefit is not a "plan," an employer's involvement in a "scheme" of ongoing administration will make even a one-time payment such as a death benefit a "plan." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987). Randolph-Macon's offer of insurance to its employees, and most especially the involvement of the college's Human Resources department in the administration of this benefit, make this an ERISA employee benefit plan, regulated by Federal law. *Id.*

---

[1]Turner died intestate two months after her son, and on January 27, 2006, Louis and Louise Smith qualified as the administrators of her estate.

ERISA is the most comprehensive of any Federal law in displacing state law, declaring baldly, "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan..." 29 U.S.C. § 1144(a) (2007). A law "relates" to employee benefit plans if it has "a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983); *See also Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007). Even laws which are not intended to affect benefit plans are swept aside if they impinge on Congress's regulation. *Shaw*, 463 U.S. at 98. A narrow exception to this broad preemption is drawn for laws which "regulate[]insurance, banking, or securities." 29 U.S.C. § 1144(b). To decide if a law which "relates" to insurance also "regulates" it, and thus avoids preemption, courts apply a two-part test:

> First, the state law must be specifically directed toward entities engaged in insurance. Second, as explained above, the state law must substantially affect the risk pooling arrangement between the insurer and the insured.

*Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003). Here, the controversy is over the validity of a change of beneficiary designation when competence and undue influence are in question. Applying these factors to that issue, the Court finds that rules governing a change in beneficiary have no effect on risk-spreading, and is certainly not limited to the insurance industry. Indeed, the law of competence and undue influence is predominately drawn from the law of wills; although most cases do not hold it explicitly, courts simply assume that the same rules govern both. *See, e.g., Tinsley v. General Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000) (referring to the "testator" in a discussion of life insurance). In *Adams*, the Fourth Circuit held that the substantial compliance doctrine, drawn from contracts and wills law, was not a "regulation" of the insurance industry. *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 561

(4th Cir 1994).[2] The same conclusion must follow for the question of undue influence, which is a species of fraud found in diverse areas of law such as deeds and wills, and for competence, a requirement for marriage, contracts, and testamentary dispositions. *See, e.g., Martin v. Phillips*, 235 Va. 523, 369 S.E.2d 397 (Va. 1988). ERISA will control the question.

The Fourth Circuit has had occasion to observe, "ERISA is silent on the matter of which party shall be deemed beneficiary among disputing claimants." *Adams*, 30 F.3d at 562. In such cases "the Supreme Court and the Fourth Circuit have authorized federal courts to develop federal common law of rights and obligations under ERISA-regulated plans." *Id*; *See also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989). Courts struggle somewhat with what "federal common law" means, and what its sources should be. The Fourth Circuit has held that federal common law should be "consistent across the circuits," albeit while still authorizing the use of state law to guide the Federal analysis. *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1453 (4th Cir. 1992). This formulation would suggest that district courts should regard even precedent from outside their circuit as controlling as long as no conflicting in-circuit law exists. The Seventh Circuit seemed to have endorsed that approach when it adopted the Fourth Circuit's *Adams* test for substantial compliance with beneficiary changes to ERISA plans. *Davis v. Combes*, 294 F.3d 931 (7th Cir. 2002).

The federal common law of undue influence was first announced in *Tinsley v. General Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000).[3] The Sixth Circuit, finding the issue to be one

---

[2] *Adams* was based on the older McCarran-Ferguson factors derived from *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48-49 (1987). These were overruled by *Miller*, but the result in *Adams* and the instant case will not change.

[3] *Tinsley* shares with the case at bar not only a name, but extraordinarily similar factual circumstances, involving a deathbed change in life insurance beneficiary of an ERISA plan which was purportedly the result of undue influence.

of first impression, considered the law of the states within its area of responsibility. Giving effect to *Singer* by simply accepting the Sixth Circuits's approach would mean imposing the law of Michigan, Ohio, Kentucky, and Tennessee on the entire country merely because the issue arose first there. For courts located in Virginia, it means deviating significantly from the more easily proven three-pronged approach taken by the local courts. *Martin, et al. v. Phillips, et al.*, 235 Va. 523, 527; 369 S.E.2d 397, 399 (Va. 1988).

While acknowledging some uncertainty, this Court finds that the interests of national uniformity which ERISA's preemption clause is designed to secure makes adoption of the Sixth Circuit's enunciation of undue influence test the most prudent course. The *Tinsley* test is not highly idiosyncratic or otherwise problematic for nationwide application. Even if it does not comport exactly with what this Court or the Fourth Circuit might have adopted in its absence, it provides a perfectly suitable framework for analysis of this case:

> [U]ndue influence is generally defined as influence that is sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's inclination and free will. An individual's influence is undue when it restrains a testator from disposing of property in accordance with the testator's own wishes and judgments and substitutes the wishes or judgments of another. The undue influence must so overpower and subjugate the mind of the testator as to destroy the testator's free agency and make the testator express another's will rather than his or her own. A showing of mere motive or opportunity to exert excessive control over another is not enough to make out a claim of undue influence; rather, the influence must actually be exerted, either prior to or at the time of the execution of the relevant document. Courts have looked at a number of factors to determine whether undue influence has been exerted in a given case, including the physical and mental condition of the benefactor; whether the benefactor was given any disinterested advice with respect to the disputed transaction; the "unnaturalness" of the gift; the beneficiary's role in procuring the benefit and the beneficiary's possession of the document conferring the benefit; coercive or threatening acts on the part of the beneficiary, including efforts to restrict contact between the benefactor and his relatives; control of the benefactor's financial affairs by the beneficiary; and the nature and length of the relationship between the beneficiary and the benefactor. As our summary of the law suggests, the inquiry into the exercise of undue influence is a highly fact-intensive one.

> Moreover, as a result of the subtle and often covert ways in which undue influence may be exercised, it must often be proven by means of circumstantial evidence.

*Tinsley*, 227 F.3d at 704-05 (internal citations and quotations omitted).

A very similar line of reasoning leads this Court to accept the standard for determining mental capacity adopted by the District of Maryland and cited by the Northern District of Ohio:

> To be capable of effecting a valid change of beneficiary a person should have clearness of mind and memory sufficient to know the nature of the property for which he is about to name a beneficiary, the nature of the act which he is about to perform, the names and identities of those who are the natural objects of his bounty; his relationship towards them, and the consequences of his act, uninfluenced by any material delusions.

*Metropolitan Life Ins. Co. v. Hall*, 9 F. Supp. 2d 560 (D. Md. 1998); *see also Metro. Life Ins. Co. v. McCloskey*, 36 Employee Benefits Cas. (BNA) 2755 (N.D. Ohio 2005). As with the *Tinsley* test, this statement deserves deference to promote uniformity of federal common law and ease of ERISA plan administration.

Federal common law also accords documents which appear valid on their face a presumption of validity against attacks based on undue influence or incompetence. *See, e.g. Rice v. Office of Servicemembers' Group Life Ins.*, 260 F. 3d 1240, 1247 (10th Cir. 2001) (decedent entitled to presumption of competence in life insurance context). The burden of persuasion must rest on the party seeking to set aside an otherwise valid document, so that ERISA plan administrators may safely rely on the paperwork they have on file.

Although there does not appear to be federal common law on the exact standard of review for undue influence, it is generally regarded as a species of fraud which must be shown by clear and convincing evidence. *See, e.g., Jarvis v. Tonkin*, 380 S.E.2d 900, 903 (Va. 1989)

### III. FINDINGS OF FACT

There is no evidence which would permit a finding of incompetence. Numerous witnesses testified that Rowland, although weak and under the influence of pain medication, was still able to hold conversations about, for instance, sporting events he watched on television. Nobody testified to any insane delusions. Nobody testified that he was unable to identify his family members or Tinsley. Nor is there any evidence that he was unaware that he was signing a change of beneficiary form, or unaware of the consequences of signing. On the contrary, the testimony is that all of this was explained to him and he appeared to understand it.

The evidence of undue influence is more substantial. Louis Smith, according to his own testimony, actively sought to persuade Rowland Smith to alter the beneficiary designation of the life insurance in issue. He testified that he was the one who procured the necessary form and filled it out, bringing it to Rowland for signature only. According to Louis' account, he came from California because of Rowland's impending death. The family had regular meetings without Rowland or Tinsley to discuss the implications of his illness and the need for arrangements to be made. Without any input from Rowland, the family decided that the $30,000 life insurance policy beneficiary should be changed so that the funeral would be paid from it and money also provided to Rowland's mother and sister. Rowland's retirement benefits, which were payable to his niece, would not be changed, nor would any of his other policies.

Sandra Tinsley, meanwhile, was not a party to these discussions and knew nothing of them. She testified, and her testimony was not challenged, that she had been Rowland's girlfriend for 28 years, although they had lived together only for a small fraction of that time. She has apparently stood by him through difficulties with drug abuse. Rowland himself also

helped to support Tinsley when he was able and clearly trusted her.[4] In an answering machine message, he declared his love for her. Hospital admission records show her as "Relative One," with none of his blood relatives listed; this is consistent with Tinsley's testimony that it was she who transported him to the hospital for the last time. Tinsley was close to Rowland's family and for many years they treated her well. She participated in family events with Rowland, and his mother particularly appreciated her attention and caring for him. All of this changed as his health deteriorated. The Court finds Tinsley credible and accepts her testimony at face value except as noted below.

Despite this long history, the decedent's aunt, Marva Blair, testified that she asked Tinsley to "stay away" from Rowland at the hospital, because he had family and did not need her anymore. Blair also accused Tinsley of shutting off Rowland's phone or its ringer.[5] Blair also claimed that she did not know what sort of relationship Tinsley and Rowland had, or whether it could properly be called romantic. Before Louis arrived from California, Blair was present when Rowland was executing a power of attorney. He had decided that Tinsley should be his attorney-in-fact, but Blair convinced him to add Louis' name as well. Louis then took control over Rowland's financial affairs as his attorney-in-fact, completely displacing Tinsley because he was, in his words, the "family member." For instance, he immediately closed Rowland's bank

---

[4] Documentary evidence showed that a joint bank account was opened in both of their names near the end of Rowland's life. He had sought to grant her power of attorney to manage his affairs while in the hospital, but was persuaded by his aunt (according to her own testimony) to add Louis as a second attorney-in-fact. In addition, the family testified that he had spent–wasted, from their perspective–some substantial fraction of his money on Tinsley many years ago.

[5] The ringer to Rowland's hospital phone was indeed turned off, but by an unknown party. Apparently Rowland had difficulty with the hospital phone and preferred to rely on his cell phone, provided by Tinsley.

account, apparently placing the funds under his sole control. The Court finds that the family as a whole became hostile to Tinsley only after Rowland was hospitalized, apparently concerned that she and not the family would receive what was left in his estate. But as Tinsley herself testified, she was unaware of Rowland's decision to enroll in the life insurance program and name her beneficiary in 1992, and that thus that decision was entirely the result of his independent will and reflected his considered wishes.

The testimony of Sharon Saunders, an HR representative at Randolph-Macon, included a dispute with Tinsley over what exactly she had asked Rowland when she first visited him at the hospital and what he had replied. Saunders testified that she asked Rowland if he wished to change his address from his aunt's house (where he lived) to Tinsley's house, and that he replied that he did not wish to make changes. Tinsley believed that Saunders had asked Rowland about a change of beneficiary. The Court finds Saunders credible, and that the dispute is the result of a misunderstanding rather than any effort to mislead. But it is clear that until Louis arrived with a completed change-of-beneficiary form, Rowland requested no changes at all. Rowland was therefore not the impetus behind the changes; Louis was.

Saunders said that she was concerned when Louis brought the change form to her, and called Rowland to confirm it. It is not known who, if anyone, was present with him in the room at the time of the call. Other evidence showed that Rowland found it difficult or impossible to use the hospital phone without assistance, and Saunders did not indicate if she called the hospital phone or Rowland's cell phone. Saunders testified that essentially all Rowland said was yes, he had signed the form and agreed to the changes. The Court finds this credible but of limited probative value except to show that the signature on the form was genuine, a fact never in dispute.

All parties agreed that Rowland was enfeebled in both body and mind by his severe illness and the treatments he received, most especially for pain. His treating physician, Dr. Dwight Oldham, wrote and signed a letter, captioned "MEDICAL STATEMENT," (Tinsley Exhibit 1) which indicated that Rowland was receiving regular doses of morphine. Dr. Oldham opines that there was a "reasonable probability" that this affected Rowland's judgment. Administration of morphine is also reflected in the nurse's notes, which are Louis' Exhibit 1.

Tinsley stated that she visited Rowland on October 31, 2005, and found him with his lip bleeding and a nurse attending to it. The nurse told her that she did not know how Rowland's lip was injured, and also that Louis had just left. Rowland told her that Louis hit him. Under oath, Louis denied ever striking his brother. Rowland's and Louis' cousin, Joyce Wynn, testified that she was in the room that day at the time that Rowland signed the form and that no physical coercion was applied.

## IV. CONCLUSIONS OF LAW

In light of the evidence, the Court finds that Rowland was competent to make the change in beneficiary. However, the question of undue influence is a different matter. Evaluating the facts found above in light of the *Tinsley* factors, the Court finds that Rowland's clearly expressed independent wish was for Sandra Tinsley to receive the proceeds of the policy in issue. He had first expressed that wish on the beneficiary form placed in evidence almost three and a half years before entering the hospital, and did not waver in it until about two weeks before his death.

The Court finds that he had no opportunity for independent advice on the disposition of his life insurance. Although Louis is himself not a named beneficiary, he is an heir to his mother's estate, and his mother was herself in a weakened state at the time of Rowland's hospitalization, which had resulted in Louis being appointed her attorney-in-fact as well. Thus,

at the time that he procured the change in beneficiary from Rowland, he changed it to benefit another for whom he held power of attorney. Furthermore, the Court finds that he acted as the agent and representative of the family as a whole, which received the majority of the proceeds. As he stands before the Court today, having paid some of the funeral expenses and as heir to his mother's estate, Louis stands to receive a substantial share of the funds should the change of beneficiary be upheld. For these reasons, his advice to Rowland concerning the change cannot be considered disinterested and Louis must be treated as a person benefitting from the change he procured. Rowland seems never to have discussed the matter with anyone *other* than Louis, not even his long-time girlfriend and original beneficiary, and thus received no independent advice. Nor does Rowland seem to have truly "discussed" the matter at all, it being Louis' testimony that his brother simply agreed with everything he proposed. In addition, Louis was the driving force behind the change; he provided the forms, filled in his own desired new beneficiaries, and presented it in that form for Rowland's signature.

There is no doubt that the family, through Marva Blair, sought to limit contact between Rowland and Tinsley, and also to limit her influence in his life by adding Louis as attorney-in-fact.

In conclusion, this Court finds clear and convincing evidence that Louis Smith and his family exercised undue influence over Rowland Smith to induce him to sign the change of beneficiary form on October 31, 2005. The beneficiary form of that date is accordingly ineffective. Therefore, the previous beneficiary form stands as the valid designation of beneficiary. An Order will follow.

The Clerk of the Court is directed to send a certified copy of this Opinion to all parties.

ENTERED: /s/ Norman K. Moon
U.S. District Judge

April 4, 2007
Date